## No. 11,569.

### J. W. BROWN VS. B. D. VITTUR.

In order that a plaintiff may maintain an action for malicious prosecution, three things must concur:

1. The suit must have terminated, after trial of its merits, in favor of the accused.

2. The motive must have been malicious.

3. The suit must have been instituted without any probable cause.

The discharge of the plaintiff by the committing magistrate is *prima facie* evidence of the want of probable cause, and the burden of proof is shifted on the defendant.

Want of probable cause is presumptive evidence of malice.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*Louque & Pomes* for Plaintiff and Appellee.

*C. H. & C. C. Luzenberg* for Defendant and Appellant.

The opinion of the court was delivered by

WATKINS, J.   This action is for the recovery of ten thousand dollars damages for a malicious prosecution, the plaintiff's petition

alleging his arrest under an affidavit made by the defendant, and his subsequent imprisonment thereunder; all, through malice and want of probable cause.

The defendant's answer admits the affidavit, arrest and imprisonment, but avers that he acted without malice, and upon probable cause.

On the trial there was judgment in favor of the plaintiff for the sum of one hundred and twenty-five dollars, and defendant has appealed.

Plaintiff and appellee filed an answer to the appeal, and requested an amendment of the judgment in his favor, so as to award him the sum of ten thousand dollars originally claimed; hence as the case now stands, it is just in the same position it was in the first instance.

It appears from an affidavit which is appended to the transcript by consent of parties that the defendant, Vittur, lodged in the First Recorder's Court, on the first of August, 1893, a complaint against the plaintiff, to the effect that he did "feloniously take, steal and carry away sixteen feet of shafting of the value of fifteen dollars, and eighteen feet and two inches of gas pipe, of the value of ten dollars   *   *   *   the property of the affiant," the charge being one of petit larceny.

On this state of facts the averments of the plaintiff's petition are that, under said affidavit, he was arrested, locked up in the parish prison as a common thief, and his pockets searched and his money taken away from him; and, being "unable to hire a messenger to request some of his friends to sign a bond for his release,   *   *   * he lingered in the parish prison during four days among the criminals."

They are, further, to the effect that he "was finally bailed out, and his case was called up on the 18th of August, 1893, when he was honorably acquitted."

His petition affirms "that he has always been a good and honest citizen; that he has never been arrested for any offence, and that his reputation among his fellow-men has never been impugned."

He further avers that "he is compelled to labor for his living, being a machinist and engineer—an occupation requiring the confidence of his employers."

He thereupon charges that his wrongful arrest and imprisonment in the parish prison upon "false charges" has "humiliated him and

injured his feelings to the extent of ten thousand dollars," and he avers that the defendant, Vittur, made said affidavit through malice and without probable cause.

It is evident that the sole question is, whether, as plaintiff affirms, and defendant denies, there was, on the part of the latter, malice and want of probable cause in swearing out the affidavit and pro-curing the arrest of the former.

This is the issue the defendant was called upon to meet with proof.    The arrest and confinement in the parish prison were the necessary consequences of the plaintiff's arrest; there is no charge, or intimation even, that the defendant was party to the act of his valuables being taken away from him while under arrest, or that same were taken away for the purpose of depriving him of the means of procuring a messenger to send for his friends, in order to procure assistance and security on his bond.

Attached to the petition is a copy of the evidence that was ad-duced on the trial in the Recorder's Court, and amongst other testi-mony that of the defendant, who was the prosecuting witness in that case.    The substance of which is as follows:

That the shafting and pipe described in the affidavit belonged to him, and that other persons had informed him that Brown (the plaintiff) had moved it away.    Said it was situated in the yard of a house on Gravier street, and was worth twenty-five dollars.    That he had sold the engine to one Sturm, but had not sold the shafting.

That of the proceeds of the sale Brown received one hundred dol-lars and he had received four hundred dollars in cash and notes.

Another witness states that all he knew about the transaction was that when he arrived he " found the stuff lying on the banquette in front of the gate and Mr. Brown was standing there with it.    That he had the stuff picked up and put back in the yard, and told him he could not get the machinery without an order, and be believes he brought it to Mr. Weber."

Another witness states that Brown came to him and said he wanted to use the shafting for rollers for moving a safe.    That he (witness) walked to the street corner and back, when he found that Brown had moved the things on the banquette.    He further states that he had given him an order for the things, he having claimed that he had forgotten them when he took the gas engine.    Witness states that he refers to the shafting and gas pipe that was in the house.

39

On this summary of the evidence the plaintiff was discharged, with the statement that no case had been made out against him.

On the trial of the instant case, however, the testimony was very greatly amplified, and the facts were gone into more in detail.

The facts, as we gather them from the record, as they are related by plaintiff's witnesses, seem to be as follows:

That the defendant was the owner of a gas engine, which he desired to dispose of, and this fact was communicated to Brown, the plaintiff. The gas engine was at the time in the possession of John Weber, who had placed it in his yard. Being informed of Vittur's intention to sell, Henry Sturm became the purchaser of the gas engine and everything belonging to it; and, subsequently, employed Brown, the plaintiff, who is a professional machinist, to erect the gas engine in his shop. That, after the sale had been completely consummated, Vittur gave Brown an order on Weber to deliver "the gas engine and everything belonging to it." That Brown subsequently "gave the order to Weber, who thereupon delivered the gas engine and everything belonging to it, *with the exception of the shafting and gas pipe, which was left on account of its not being of much value, and because the wagon could not carry any more.*" (Our italics.)

That Brown then informed the foreman in charge of Weber's yard "that, in case he needed the shafting and pipes, he would come for them;" and that Weber's employé replied "that it was all right," that all "he had to do was to raise the bar on the gate and come in." That, two or three months after the sale of the engine, plaintiff asked Mr. Sturm, the purchaser, to give him those pieces of shafting and gas pipe; and Sturm accordingly gave him an order on Weber for them. That he then went into Weber's yard and put the pieces of shafting and gas pipe on the sidewalk; "when, then and there, he was informed by Suermann, an employé of Weber, that he could not get them unless he obtained an order from Weber."

That he then obtained an order from Weber, but when it was presented the foreman refused to recognize it, and demanded an order from Vittur before he would deliver the shafting and pipe.

On the other hand, the facts as related by the defendant's witnesses are the same, with the important exception that, the *shafting and pipe did not belong to the gas engine* that had been sold to Sturm at all, but belonged to and formed a part of a *steam engine* that was in Atlanta, Ga., and same *were of considerable value.*

As a witness, the defendant made this positive statement, viz.:

Q. Now as to that piping, what kind of piping was that?

A. It is a two-inch steam pipe which I used for a twenty-five horse-power engine which came from my factory in Atlanta, Ga. That steam pipe was never used in this State and never had anything to do with that gas engine; and I suppose Mr. Brown ought to know it, because Mr. Brown put up that steam engine for me himself. He knows it very well if he wants to.

The testimony of the defendant is substantiated by another witness, who says:

Q. Do you know where Mr. Vittur got that shafting from?

A. Yes; he got it from Atlanta, Ga.

Q. Do you know what that shafting was used for?

A. It was used to drive machinery.

Q. Do you know what kind of machinery it was used to drive?

A. It was used to drive a grinding stone. It came from a steam engine that never had been in New Orleans. I moved that shafting myself and some other machinery from the Northeastern railroad depot. I moved two dray loads.

Q. Do you know anything about that pipe?

A. Yes, it belonged to that steam engine, too. I moved it from the Northeastern depot to the shop.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. So that you are positive that that particular shafting and piping did not belong to the engine which Mr. Vittur sold to Mr. Sturm?

A. No, it did not; it came from Atlanta, Ga., and we had it in the shop, but as we had no room for it there, Mr. Vittur put it at Mr. Weber's place.

His testimony is further supported by the statement of another witness—an agent for the sale of gas engines, as follows, viz.:

Q. What is your business?

A. I am agent for the Otto gas engine.

Q. Did you ever put up a gas engine for Mr. Vittur?

A. I don't remember. We sold Mr. Vittur a gas engine, but I believe Mr. Vittur had his own people to put it up.

Q. Did you sell him any shafting with that gas engine?

A. No; when we make a contract for the sale of the gas engine we simply sell it as it comes to us from Philadelphia. If there is to be any shafting and pipe furnished *we always make a separate contract.*

And this is corroborated by the testimony of Mr. Gschwendt, an expert.

He testifies:

Q. Is it customary in the sale of a gas engine to sell gas pipe with it?

A. No.    *    *    *

Q. Shafting don't go with the gas engine?

A. No, except the crank shaft.

Q. But sixteen feet of shafting don't go with the gas engine?

A. No, that don't go with the gas engine.''

He is circumstantially corroborated by another witness, who contradicts plaintiff's theory that the shafting was old and worthless material. His statement is as follows, viz.:

Then I had my men put those things in the yard and cover them up with lumber. It was a very nice piece of steel shafting, I thought, so I wanted to preserve it.

Q. That shafting seemed to be in perfect order?

A. Yes, sir.

Q. And the pipe was also in perfect order?

A. Yes sir.

Q. I understood you to say that so far from this shafting and pipe being no good, that they were in perfect order?

A. Yes, I considered them in perfect order, and I worked in a machine shop when I was quite a young man.

Taken as a whole, we think the foregoing testimony makes it perfectly clear that the plaintiff was in error in taking possession of the shafting and pipe as parts of *the gas engine* which the defendant had sold to Sturm some months previously.

It is equally clear that they constituted parts of a *twenty-five horsepower engine* which came from the defendant's factory at Atlanta, Ga., and never were attached to the gas engine at all. It is also evident that this shafting and pipe were new and not old waste material.

But whatever may have been the real state of the case in point of fact, it is evident that the defendant had probable cause for his prosecution of the plaintiff in the Recorder's Court. He believed himself to be the real and rightful owner of the property of which the plaintiff was found to be in possession under suspicious circumstances which needed explanation.

In applying the law applicable to the case, we need go no further than the syllabus of the plaintiff's brief, which we copy and use as our own to find its proper solution, the substance of it being that the prosecution complained of must have been malicious and "without any probabe cause." The burden of establishing want of malice and the existence of probable cause was placed upon the defendant by plaintiff showing his discharge from the prosecution. We think, however, the defendant has discharged that burden and exonerated himself from imputation of malice.

Before making the affidavit complained of the defendant consulted an attorney, and after placing the facts before him he acted upon that attorney's advice. The judgment appealed from is erroneous and must be reversed and annulled.

It is therefore ordered and decreed that the judgment appealed from be avoided and reversed, and proceeding to render such judgment as should have been rendered in the court below, it is ordered and decreed that the demands of plaintiff be rejected at his cost in both courts.