No. 3398

Second Circuit

MELSON v. CALHOUN

(January 21, 1929. Opinion and Decree.)
(March 12, 1929. Rehearing Refused.)
(April 22, 1929. Writ of Certiorari and Review Refused by Supreme Court.)

Hugh Tullis, of Vidalia, attorney for plaintiff, appellee.

G. P. Bullis and Dale, Dale & Dale, of Vidalia, attorneys for defendant, appellant.

ODOM, J. This is an action to recover damages for malicious prosecution. Plaintiff alleges that defendant, maliciously and without probable cause, caused him to be arrested for a crime for which he was prosecuted and acquitted. The defendant admits that he caused the arrest and prosecution, but resists the action on the ground that he acted without malice and that there was probable cause for the criminal proceedings, and that he acted upon the advice of his attorney. The case was tried before a jury, which resulted in a verdict and judgment for plaintiff for $1,012.50; and defendant appealed.

### OPINION.

In order to maintain an action of this kind, it is necessary that plaintiff show that defendant, in causing the arrest and prosecution, was actuated by malice and that he acted without probable cause. The burden is upon plaintiff to prove both malice and absence of probable cause.

The authorities on this point are so numerous that we think it unnecessary to refer to them. We do, however, cite two leading cases by our own Supreme Court, viz:

Barton vs. Kavanaugh, 12 La. Ann. 332; and Estrada vs. Kreeger, Incorporated, 147 La. 291, 84 So. 786. (See also "Malicious Prosecution," 38 C. J. 386, and 18 R. C. L., pp. 28 and 33.)

That Calhoun, the defendant in this suit, was prompted by malice and that he acted without probable cause in having plaintiff arrested is proved to our entire satisfaction. The pertinent facts are that in October, 1926, the plaintiff, Melson, borrowed from the defendant, Calhoun, the sum of $350.00, and gave his note, secured by chattel mortgage on a Buick automobile then in the Parish of Concordia, where both parties lived. The mortgage was duly inscribed in the Chattel Mortgage Records of that parish. Subsequently, probably in the month of November, plaintiff disposed of the mortgaged car without paying the note. More than a year later, on January 31, 1928, the defendant, Calhoun, appeared before a magistrate and made affidavit, reading, insofar as the same need be quoted, as follows:

"That on or about the 1st day of April, 1927, within said Parish of Concordia and State of Louisiana, one C. E. Melson did then and there, wilfully, feloniously, and of his malice aforethought sell one Buick Touring Car, Motor No. _____, Serial No. 469309, having chattel mortgage in favor of the affiant, contrary to the statutes of the State of Louisiana, in such cases made and provided and against the peace and dignity of same.

"WHEREFORE, affiant prays that the said C. E. Melson be arrested and dealt with as the law directs."

Whereupon, the magistrate issued an order, directing the sheriff to arrest Melson, the plaintiff. He was arrested and released on bond. This affidavit reached the district attorney in due course and he filed a bill of information against Melson, charging that

"did unlawfully sell and dispose of one certain automobile, described as follows: One Buick touring car, Motor No. ----------, Serial No. 469309, the said Melson being at the time the owner of said automobile, with the fraudulent intent to defeat a certain chattel mortgage then and there being and resting thereon in favor of one J. L. Calhoun, in the sum of $350.00, said chattel mortgage being recorded in Chattel Mortgage Book No. 6, of the chattel mortgage records of Concordia Parish, State of Louisiana."

Under this indictment, Melson was prosecuted and acquitted; and this suit followed.

## ON THE QUESTION OF MALICE.

Plaintiff admits that he disposed of the car which he had mortgaged to defendant, without first satisfying the mortgage. But he testified that, before doing so, he consulted defendant and obtained his unqualified assent and approval. He says he went to see Calhoun at his residence, near Ferriday, Louisiana, and told him that he had a chance to better his (Calhoun's) security by trading the mortgaged car for a better one by paying $100.00 difference, and that Calhoun told him to go ahead and make the trade; that he (Melson) asked if he should transfer the mortgage to the other car and that Calhoun said:

"There would be no need of that—but go ahead and make the trade."

Melson testified that the car for which he traded was kept at the "M. & N. Service Station," operated by him and Horace Newton, and that Calhoun saw the car the next day and on numerous occasions thereafter. This was in the latter part of September, 1926. Melson further testified that on the day after he traded for the other car, Calhoun saw it and commended him for his shrewd trading and said:

"He would like for me to do some trading for him."

Calhoun, as a witness, denied that he had consented to the trade and, during the course of his examination, said he knew nothing of it until in September, 1927. If Calhoun had said no more and if there were no circumstances to corroborate the testimony of either, we would be in doubt as to whether Calhoun knew of the disposal of the Buick car by Melson and whether he had consented thereto. But Calhoun's other testimony and the circumstances corroborate the testimony of Melson so that we accept that of Melson as being true, as the jury and the lower judge evidently did.

Calhoun testified that Melson had made two payments, of $27.00 each, on the note in the latter part of 1926, but that nothing further was ever paid. The parties lived in the same community and Melson, after he traded for the Oldsmobile car, used it in connection with the service station which he was then conducting. Calhoun, on cross-examination, was asked if it were not a fact that he had seen Melson using the other car between the date on which he took the mortgage on the Buick and September, 1927, when he says he found out that the car had been disposed of, and he said:

"I had seen Melse with this other car;"

and further,

"I hadn't seen the Buick car since the

day he (I) taken the mortgage on it—to know it."

He took the mortgage in the latter part of 1926, and, from that date down to September, 1927, he had never again seen the Buick car, but had seen Melson driving another of a different make. This, we think, taken in connection with circumstances, is sufficient to turn the scale in favor of Melson's testimony.

The testimony shows that Melson was operating a service station, and, in September, 1927, about nine months after he made the last payment to Calhoun on the car, Calhoun purchased from him an undivided one-half interest in Melson's business for a cash consideration of $800.00, and the two entered into a partnership for one year to operate said station and to sell Chevrolet cars. Melson says that at the time the $800.00 was paid over to him by Calhoun, he suggested to Calhoun that he deduct from the amount the balance due on the note for the car, and that Calhoun declined to do so, stating that he, Melson, would be better able to pay the note later on. Calhoun denies this. But, certainly, Calhoun could have collected the amount due him if he had demanded it. Calhoun says that on the following day he discovered that Melson had disposed of the mortgaged car. Negotiations for the purchase by Calhoun of an interest in this business and for the forming of the partnership were pending for several days. Calhoun does not explain how it happened that he found out on the day following the closing of the trade that Melson had disposed of the car. However, in view of his other testimony and in the light of the circumstances which followed, we think it easily understood why he claimed that he had not discovered that the Buick car had been disposed of until the day following the consummation of the partnership arrangements. The affidavit made by him is dated January 31, 1928—more than four months after he says he gained this information, and when he was asked why he did not institute the criminal prosecution before, his answer was that he did not care to prosecute a partner in business.

The partnership formed in September continued until January following, when the two disagreed. It was proposed that either Melson would purchase Calhoun's interest, or Calhoun would purchase Melson's. Pending the settlement, the doors were closed and locked, the keys carried to and left at the bank, with the understanding that they should not be re-possessed by either, unless both were present. Melson left the parish in quest of funds to buy Calhoun's interest. Calhoun, subsequently, got possession of the keys and re-opened the business, his stated reason being that Melson had violated his partnership agreement. Finding Calhoun in possession of the business and operating it, Melson filed suit for a settlement of the partnership affairs and, incidentally, asked for the appointment of a receiver. This was on January 29th, and service was made on Calhoun on January 30th. On the next day, Calhoun went before the magistrate and filed the criminal charge. He admitted that he cherished no good feeling towards Melson, his reason being that Melson had violated or gone back on his agreement, and he was asked:

"Did you have any malice against Mr. Melson?"

He replied:

"No, sir, I can't say that I did."

He was further asked:

"Did this feeling that you had that Melson had treated you badly have anything to do with your making this criminal charge?"

And he said:

"Well, I can't say that it did."

He failed, however, to say that it did not.

The facts and circumstances convince us, first, that Calhoun knew all along that ·Melson had disposed of the car and that the disposal was made with his consent and approval; and, second, that in making the criminal charge, he was actuated by legal malice engendered by Melson's suit for settlement of the partnership.

## ON THE QUESTION OF PROBABLE CAUSE.

Even though defendant was actuated by malice, if he had "probable cause" for making the charge, plaintiff's ·suit for damages must fall.

The Chattel Mortgage Law, Act 198 of 1918, Sec. 8, under which the arrest and prosecution were made, provides that any owner or other person who shall sell or dispose of any property mortgaged under the act "with fraudulent intent to defeat the said mortgage," shall be guilty of a misdemeanor. A sale or disposal of a chattel mortgage is not necessarily a violation of the act. To constitute the offense denounced thereby, the sale must be made "with fraudulent intent to defeat the mortgage."

Melson was guilty of no criminal offense, because he had no fraudulent intent. However, "probable cause" in the sense here used, or the absence of it, is in no sense dependent upon the guilt or the innocence of the accused, but depends upon the prosecutor's belief in his guilt based upon reasonable grounds.

38 C. J. 405:

"Probable cause is a state of mind in this, that the facts are regarded from the point of view of the prosecutor." 38 C. J. 403.

Gates vs. Union Sawmill Company, 122 La. Rep. 437, 47 So. 761;

Sandoz vs. Veazie, 106 La. Rep. 202, 30 So. 767.

"In civil actions, 'probable cause' has been said to be such reason supported by facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it, are legally just and proper."

Or:

"The existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge ·of the prosecutor, that the person charged was guilty of the offense for which he was prosecuted."

18 R. C. L., Sec. 20, p. 35; see also 38 C. J. 403; "Words & Phrases," 1st Series, Vol. 6, p. 5620.

In the case of Barton vs. Kavanaugh, 12 La. Ann. 332, the trial court was asked to charge the jury that the mere belief of the affiant in the truth of his charges would exonerate him. On appeal, the Supreme Court held that such charge would be improper and said:

"But it would be proper to instruct them that 'probable cause does not depend upon the actual state of the case, in point of fact, but upon the honest and reasonable belief of the party prosecuting'."

As was stated by one text writer:

"A definition (of probable cause) sufficiently exact to meet satisfactorily every possible test would be difficult, if not impossible, but * * * there seems to be sufficient substantial agreement * * * to warrant the statement that the standard of conduct for beginning or continuing any proceeding, whether civil or criminal, is that of a reasonable or ordinarily prudent man placed in the same situation as the defendant."

Calhoun knew that Melson had disposed

of property under chattel mortgage and, if he acted in good faith and used proper caution and made the charge against Melson in the honest and sincere belief that such disposal, under the circumstances as he knew them, constituted a criminal offense, he had "probable cause" for causing the arrest and prosecution, and plaintiff's suit for damages must fall for that reason. But the testimony does not warrant a holding in his favor on that point.

Before making the affidavit, he went to his attorney, Mr. Bullis, and told him that he had a note against Melson for $350.00, secured by a mortgage on a car, and that Melson had disposed of the car. Mr. Bullis, as a witness, testified as follows:

"He told me that this was done without his knowledge or consent. I advised him that, under these facts, I could file a suit against Melson for the $350.00 note, but that I could not do anything about the action of Melson removing and selling his security. I told him that in my opinion these facts constituted a violation of the chattel mortgage law which makes such action a criminal offense. *I told him that the District Attorney was the man to handle all criminal matters and that he should lay the matter before the District Attorney, if he desired to take any action other than filing a suit on the note.*"

The advice of counsel in matters of this kind will protect a prosecutor, provided all the facts are stated. Calhoun not only did not state all the facts to his attorney, but he misstated them in that he said the car was removed without his knowledge or consent. His attorney told him that in his opinion "these facts constituted a violation of the chattel mortgage law." But the attorney went further and specifically told him that the district attorney was the "proper man to handle all criminal matters and that he should lay the matter before him if he desired to take action other than filing a suit on the note." The attorney did not pretend to advise him, but cautiously and prudently referred him to the district attorney. But he did not follow his attorney's advice and lay the matter before the district attorney, but proceeded to the magistrate and made the affidavit. The district attorney testified that the first he knew of the charge was when Calhoun brought the affidavit to him and asked him what to do.

Primarily, Calhoun's visit to his attorney, Bullis, was not to seek information as to whether Melson had violated any law, but to get action on the note. Incidentally, Bullis told him to seek the advice of the district attorney, if he desired to make a criminal charge. A cautious, prudent man, if in good faith, would have acted upon his attorney's advice and would have sought the district attorney. No prudent man, having due regard for the rights and liberties of another, would commence a criminal prosecution without consulting the state officer to whom he had been referred by his own counsel.

More than that, we think Calhoun knew, after he talked with his attorney, that Melson had violated no law. His attorney told him, in substance, that, if the car had been removed and disposed of without his knowledge and consent, Melson had violated the law. Calhoun knew that had not been done.

Where one acts upon facts within his own knowledge, which facts to his knowledge do not constitute a crime or an offense, he cannot be said to have acted upon "probable cause." There is not one fact or circumstance connected with this case indicating that defendant, in causing the arrest and setting in motion the machinery of the criminal law against plaintiff, was actuated by a sincere desire to

enforce the law. On the contrary, the facts and circumstances force upon us the conclusion that he was actuated by a desire to punish plaintiff, because he had filed suit for a settlement of the partnership affairs.

Counsel for defendant, in oral argument and in brief, contend that Melson had in fact violated the law because he had disposed of the car without the written consent of Calhoun. But the chattel mortgage law does not make it a criminal offense to dispose of mortgaged property without the written consent of the mortgagee, but provides that if he "shall remove the same from where so mortgaged to another parish without complying with the provisions of this act, or shall remove same out of said parish without the written consent of said mortgagee," (Act No. 198 of 1918, Section 8), he shall be guilty of a misdemeanor. But the charge against Melson was that he had sold the car, and that is not a misdemeanor under the act, unless done with fraudulent intent.

Counsel also seriously contend that the lower court erred in admitting testimony before the jury that Calhoun had been twice convicted for bootlegging, which testimony, he says, prejudiced the minds of the jury. It may be that such testimony did influence the jury in arriving at its verdict, but we are not relying upon the verdict of the jury, but upon the record as brought up, and the testimony to which counsel objected, while in the record, has not influenced us in the slightest.

Lastly, counsel contend that their client is protected because he acted upon the advice of his attorney. However, as we have already stated, he did not act upon the advice of his attorney, and furthermore, the advice given by an attorney will not protect the prosecutor where the facts are incorrectly stated, or where anything is withheld, and our conclusion is that Calhoun did not divulge all the facts to his attorney.

## ON THE QUANTUM OF DAMAGE.

Plaintiff is a young man, thirty years old, and has a wife and four children. He has been engaged in business in and around Ferriday, Louisiana, for about eight years and bears, according to the witnesses, a good reputation. He had never before been arrested or accused of the violation of any law. He and his wife both testified that they were greatly humiliated and outraged by the arrest and prosecution and we have no doubt that they were. We think the plaintiff is entitled to recover, but, inasmuch as he was not placed in the jail, but when arrested, was immediately released on bond, we think the amount assessed by the jury is somewhat excessive. We think an allowance of $600.00 will do justice to all concerned.

For the reasons assigned, it is therefore ordered, adjudged and decreed that the judgment appealed from be amended so as to reduce the amount from $1,012.50 to $600.00; and that, as thus amended, it be affirmed, with costs.